JESSE BALDWIN v. ELIZABETH JOHNSON and the heirs at law of JOHN Y. BALDWIN, deceased.

A. and B. were partners in trade. B. having the management of the partnership business, purchased real property with the partnership funds, and took a deed in his own name. Although the conveyance is made to him alone, and the legal title is vested in him, he holds one moiety for the benefit of his partner A.

Although the statute of frauds declares " that all declarations or creations of trusts or confidence," &c. shall be " in writing," this is a plain case of *resulting trust*, and may be proved by parol.

A. and B. agreed to dissolve partnership, upon terms, that A. should take all the partnership property, and pay all the debts; upon which the title deeds were placed in the hands of a scrivener to prepare proper conveyances from B. to A., and A. took the care and direction of the property. The consequence was, that the equitable and beneficial interest, in this real estate, became vested in A.; and B., having received a full consideration for his proportion, became a mere trustee for the benefit of A., as a purchaser: B. still had the legal title, but as between him and A. it could avail him nothing.

After the dissolution of the partnership and deposit of the title deeds with the scrivener, B. gave a bond and mortgage on these lots to C. for eight hundred dollars; on which C. filed a bill for foreclosure against B. alone, without making A. a party; and obtained a decree for sale, which was about to take place, when A. filed the present bill, setting up his equitable title, seeking relief against the mortgage, and an injunction to stay proceedings on the former decree. B., in his answer to this bill, admits the partnership, and the dissolution, on the terms stated; but denies his indebtedness to the firm, and insists that if he was indebted, it was settled by the agreement at the dissolution. As to one part of the property purchased, (the Freeman property,) he admits it was bought with the funds of the company, and considered the property of the complainant and himself; and says the deed was made to him by mistake. As to the other part, (the Baldwin property,) he admits it was sold on an execution at the suit of the firm, that he bought it for the sum due, and took a deed for it in his own name, thereby making himself debtor for the amount of the execution; and says that he considered that property as belonging to himself; and denies that he purchased or possessed it for the use of the company, or that there was any agreement or understanding that this property should be purchased on the joint account, or that he ever agreed to convey it to the complainant. Yet, it appearing that B. had not charged himself with the amount in the partnership books, (kept by him); that in the accounts of stock, taken in several succeeding years, generally in his own hand-writing, and the inventory of the stock of the firm made at the dissolution, this property was included and

56

Oct. 1831.

Baldwin
v.
Johnson et al.

valued as the property of the firm; that B. had given in this property to the assessor, and paid taxes on it, several years, and taken receipts therefor in the name of the firm; had paid, and taken receipts, for repairs made on this property, as the property of the firm; had leased the property, and made entries of contracts with tenants, in the books of the firm, in which the property was called "our houses," &c.; had received rents and given receipts in the name of the firm; charged tenants with rents in arrear, in the books of the firm; and treated the property, in all respects, as firm property :—it must be considered as belonging to the firm, notwithstanding the legal title was in B. only.

As to the mortgage, B. in his answer says, it was given for the amount due on a note given by him to C. in 1813, and renewed in 1819, in the name of the firm, for money borrowed for their use. C. in her answer states, that she still held the notes, and took the mortgage as collateral security; that she had always understood that the property was purchased by B. in his own name, and for his own use, and the deeds made to him alone; that she never heard of the renting, the receipt of rent, or the payment of taxes, in the name of the firm, or that there was any trust connected with it, until about the time the present bill was filed. That she did not know that at the time of making the mortgage B. was not in possession of the title deeds, and had no notice of any agreement that they should be delivered up, or the property conveyed to A.; and had not heard of any change of possession, but believed it still to be in possession of the tenants who had rented of B.; and insists that she is entitled to protection, as a bona fide purchaser for valuable consideration without notice; or that, if the property should be found to be the property of the firm, the mortgage should be considered good as to one half; or, if the property should be considered as belonging exclusively to A., she was entitled to an account against the firm, for the money due on the notes, to be paid by A.—But B. never having had exclusive possession, and at the time of giving the mortgage not being in possession of the property by himself or his tenants, the property being understood and reputed by the tenants then in possession to be the property of the firm; and B. not being then in possession of the title deeds, which, if enquired for, he could not have produced; and C. having understood from B. that the title was in him, and rested on his statement without having examined, seen or enquired for the title deeds, or made any enquiry of the tenants in possession, who would have informed her that the property was not the separate property of B., but belonged to the firm, or was claimed as such, or given her such information as to put her on enquiry: her claim to be considered in the light of a bona fide purchaser for valuable consideration, without notice, cannot be sustained.

Every man purchases at his peril, and is bound to use some reasonable diligence in looking to the title and the competency of the seller: it will not answer to rest on mere reputation or belief, unless the party intends to rely on his covenant alone.

*Semble.* C. cannot claim the protection of a bona fide purchaser without notice, because there was no money paid; the mortgage was taken as a col-

lateral security, the old notes were not given up, and consequently she was not injured.

The rule is, that a person claiming protection (as a bona fide purchaser) must have paid the money; to have secured it is not sufficient.

B. having made the mortgage without authority, and C. having received it without investigation, relying on the integrity of the mortgagor, when the slightest investigation would have sufficed to satisfy her that he had no right to make it; the mortgage cannot be sustained against **A.**

If the property, being real property, is to be considered as a tenancy in common, C. had notice, or might have had notice, that the beneficial interest was vested in **A.**, and that B. by his mortgage could not bind or convey any interest in the premises; and the mortgage is unavailing.

Nor is the mortgage available, in equity, against the *moiety* of the property, although the legal title was in B. at the time; as C. had notice, or might have had notice, that it was or had been partnership property; (and the partnership being dissolved,) that B. had no right to make the mortgage.

After the dissolution of a partnership, the authority of an individual partner over the joint stock ceases; he cannot use it for his private benefit, or in any way inconsistent with the closing of the partnership business.

The whole of the partnership property is liable for the partnership debts; if all cannot be paid, they must be paid *pro rata:* this court cannot establish a preference, on the ground of an unauthorized act of one of the partners after the dissolution : the notes, therefore, were not ordered to be paid out of the mortgaged premises.

THIS is a bill for an injunction and relief; and the material facts necessary to the correct understanding of the case, are the following :—In March, 1807, Jesse Baldwin and John Y. Baldwin entered into partnership in trade in Newark, under an agreement, that Jesse Baldwin was to furnish a capital of ten thousand dollars in merchandize; to let to the company, without any charge for rent, his store-house in the town; and to let his dwelling-house, adjoining the store-house, to John Y. Baldwin, for two hundred dollars a year, from which was to be deducted one hundred dollars a year for the board of a clerk. John Y. Baldwin was not bound to furnish any capital, but to be equally interested in the profits and losses of the business; and upon a dissolution of the partnership, the dwelling-house, store-house and capital furnished, are to belong to Jesse Baldwin. The business was carried on under the name of John Y. Baldwin & Co., until the 1st of May, 1817, chiefly under the management of John Y. Baldwin, the complainant being in the city of New-York. In May, 1817, the complainant returned to Newark, and finding

the accounts of the partnership in a bad situation, he endeavoured to adjust them and bring the partnership to a close, which was not effected, however, until the 1st of January, 1820; previously to which the said John Y. Baldwin had conveyed his real estate, containing about forty-eight acres of land in Caldwell, to his mother-in-law, Elizabeth Johnson, one of the defendants. The partnership was dissolved on the 1st of January, 1820, and John Y. Baldwin was indebted to the firm several thousand dollars. It was dissolved upon an agreement, that Jesse Baldwin was to take all the partnership property and pay all the debts. An inventory was made of the property and debts, and John Y. Baldwin removed from the dwelling-house on the 1st of April following.

During the existence of the partnership, they obtained a judgment and execution against one Esther Baldwin, under which the sheriff of Essex exposed to sale two houses and lots in Newark, and they were purchased for the use of the company, for the amount of the execution. A conveyance was received for the use of the firm, dated 24th November, 1813, and possession taken accordingly; after which, and until the time of dissolving the partnership, it was held and used as partnership property; the taxes were paid out of the funds of the company, and the rents and profits went to their credit and were applied to their business. At another sheriff's sale, two other lots of land, (the property of H. Freeman,) were purchased in like manner, for the use of the company; one of which was afterwards sold, and the money paid to the credit of the company. The sheriff's deeds were executed to John Y. Baldwin alone, and no reference was had in the deeds to the interests of the complainant. At the time of dissolving the partnership, this was discovered, and John Y. Baldwin agreed to execute a conveyance to the complainant. For this purpose the deeds were placed in the hands of an attorney, but the proper conveyance was never made and executed. These lands were inventoried at the time of the dissolution, as part of the partnership property, and valued at two thousand dollars, since which Jesse Baldwin has been in the sole possession of them, and has received the rents and profits.

On the 2d February, 1820, John Y. Baldwin executed a bond

and mortgage to the defendant, Elizabeth Johnson, for eight hundred dollars, covering the lots so sold at sheriff's sale, and purchased for the firm. The mortgage was recorded on the 27th June following.

John Y. Baldwin married the daughter of Elizabeth Johnson. When the mortgage was given John Y. Baldwin was not in possession of the title deeds, and the lots were in the possession of Jesse Baldwin, under the agreement dissolving the partnership, which was known, or might have been known.

Elizabeth Johnson filed her bill to foreclose the mortgage, obtained a decree, and the property was advertised for sale. Jesse Baldwin was no party to the bill, and had no notice of it until the property was about to be sold. Jesse Baldwin called on Mrs. Johnson for explanation. She told him she had lent the eight hundred dollars to John Y. Baldwin, and taken for it the notes of John Y. Baldwin & Co.; of which Jesse Baldwin had until that time no knowledge. They were not mentioned at the time of the dissolution, nor inventoried among the partnership debts.

The bill then alleges, that those notes for eight hundred dollars were the consideration of the deed from J. Y. Baldwin to Elizabeth Johnson for the Caldwell property, as above mentioned; and also that during the existence of the partnership, J. Y. Baldwin received sundry large sums of money due to the complainant individually; and if Mrs. Johnson did loan eight hundred dollars to J. Y. Baldwin, it went to pay his own debts, and was not used for the benefit of the partnership.

The bill insists that J. Y. Baldwin could not charge the lands with the mortgage as against the complainant; or if he could, that the money, or the whole of it, is not due. It further insists, that the promissory notes given in the name of John Y. Baldwin & Co. are fraudulent, and ought to be delivered up; and in the mean time, that the sale should be stayed.

The answer of John Y. Baldwin admits the partnership, and the dissolution upon the terms mentioned in the bill. He denies his indebtedness to the firm, or if indebted, says it is to a small amount only, which was settled by the agreement at the time of the dissolution. He admits that he conveyed to Elizabeth Johnson, in 1819, his estate in Caldwell, and that the consideration

mentioned in the deed was eight hundred dollars, which was not paid in cash at the time of making the deed ; but that at the time he considered himself justly indebted to the said Elizabeth Johnson, who was his mother-in-law, in upwards of the sum of one hundred dollars, for small sums borrowed at different times ; and also, as one of the firm of J. Y. Baldwin & Co., in the sum of one hundred and fifty dollars and upwards, for interest on the promissory note she held against the firm. And he alleges that the conveyance was not made to his mother-in-law in the expectation of any difficulties with the complainant ; that the lands were not worth the amount, and were incumbered with his step-mother's dower. He admits the taking of the inventory, but says he was not present the whole time it was making out.

As to the property purchased at the sheriff's sale, he says, that the property of Esther Baldwin was sold at sheriff's sale on an execution in favour of the firm ; that he became the purchaser for the amount of the execution, and accordingly took a deed for it in his own name ; thereby making himself debtor to the firm for the amount of the execution. He denies that he purchased it or possessed it for the company ; but says that he may have used the rents and profits, or some part thereof, for the benefit of the firm, and paid taxes with the money of the firm, without crediting or charging himself, as the case might be—all which may appear by the books of the firm. He says further, that there was no agreement or understanding that this property should be purchased on their joint account.

In regard to the other property purchased at sheriff's sale, he admits it was bought with funds of the company, and that he has always considered it as the joint property of the complainant and himself. He denies any fraud or mistake in making out the sheriff's deed of the Esther Baldwin property, but alleges that the other deed was made to him by accident or mistake of the sheriff.

In regard to inventorying the lands, he says it may be so, he has no recollection of it, but denies that he ever agreed to make any conveyance to the complainant of the Esther Baldwin property ; that, on the contrary, he refused to do so. He admits that the complainant has been, since the dissolution, in possession,

and in the receipt of the rents and profits of all the said premises, but it has been against the consent of the defendant, so far as respects the Esther Baldwin property.

He admits the bond and mortgage given to Elizabeth Johnson on these premises, and insists that it was given to secure her the payment of eight hundred dollars, which he, as one of the late firm of John Y. Baldwin & Co. had borrowed of her for the benefit of the firm, in May, 1813, and which money was either paid to the complainant, or applied to the use and benefit of the firm or the complainant; that he gave the note of the firm for the money, and in 1819 he renewed the note in the partnership name, and afterwards, to secure the payment of it, gave her the bond and mortgage. He denies the charge of concealment as to the mortgage, but says he does not recollect of having ever acquainted the complainant with the existence of the bond and mortgage or the notes.

The answer of Mrs. Johnson, the other defendant, is very full; but for the proper understanding of the question in this cause, it is only necessary to state in relation to it, that she admits the giving of the deed for the Caldwell property by J. Y. Baldwin to herself in September, 1819. She supposes it worth four hundred or four hundred and fifty dollars, clear of incumbrances. At the time of making the deed, he was indebted to her in one hundred and seventy-six dollars and fifty cents, for interest on the note of the firm, and for some small sums loaned by her to him from time to time. She states there was no previous agreement between herself and J. Y. Baldwin as to the making of this deed. In regard to the property formerly of Esther Baldwin, and also the Freeman property, purchased at sheriff's sale, she always understood it was purchased by J. Y. Baldwin in his own name, and for his own use, and that the deed was made to him alone. She never heard that the rents and profits went to the firm, or that they paid the taxes, or that there was any trust connected with it, until shortly before or about the time complainant's bill was filed. She insists that she was ignorant of any change of possession of this property, as stated by the complainant, and believes it remained in possession of the same tenants that had rented of and held under John Y. Bald-

win ; and if there was a constructive possession on the part of the complainant, she had no notice of it.

The answer further states, that she is the mother-in-law of John Y. Baldwin. In 1813 he borrowed of her eight hundred dollars, for the use of the firm, and gave her the note of the firm, which she accepted, payable with interest. The note remained unpaid until May, 1819, when J. Y. Baldwin gave her a new note for the principal sum, in the name of the firm, which was given and received as a mere renewal of the original note. In 1820, and after the dissolution of the partnership, hearing of difficulties between Jesse and John Y. Baldwin, and becoming anxious about the debt, she spoke to John Y. Baldwin on the subject, and he thereupon proposed to mortgage to her the property already mentioned ; and believing that it was a sufficient security for the debt, and that it was the property of J. Y. Baldwin individually, she agreed to accept it. She says, that if at the time of making the mortgage, J. Y. Baldwin was not in possession of the title deeds, she did not know it, nor had she notice of any agreement whereby they were to be delivered up to the complainant, or whereby the property was to be conveyed to him. She denies any intentional concealment of the mortgage ; and alleges that she took the mortgage, not in lieu of the notes, but as collateral security merely, and that the whole of the principal and interest is due on it, except so far as a part of it may be considered paid by a charge against her on the books of the company, of one hundred and seventy-eight dollars and forty-four cents, and by the real and fair value of John Y. Baldwin's interest in the Caldwell property, conveyed to her as aforesaid. She insists that if the mortgaged property should be found to have been the property of John Y. Baldwin & Co., yet that the mortgage should be considered valid as to *one half*, being J. Y. Baldwin's part ; or that, if the property should be considered as exclusively Jesse Baldwin's, yet that she will be entitled to an account as against the company of the money due her on the notes, and to have the same decreed to be paid by the complainant. She denies that she ever intended to treat the debt due her as the individual debt of John Y. Baldwin, and prays that she

may not be affected by any fraudulent transaction on the part of John Y. Baldwin, if any such should be discovered.

Depositions were taken, and the partnership books, documents and vouchers exhibited; the substance of which appears in the opinion of the court.   The case was argued by

Oct. 1831.
———
Baldwin
v.
Johnson et al.

*E. Vanarsdale,* for complainant;

*J. C. Hornblower,* for defendants.

Cases cited :—5 *Ves. jr.* 193 ; 2 *Dow's P. C.* 242; 3 *Kent's C.* 14 ; *Smith* v. *Wood,* ante, 74 ; 2 *Mad. C.* 112 ; 1 *Daniel's C. R.* 80 ; 13 *Ves. jr.* 120 ; 16 *Ves. jr.* 249 ; 1 *Meriv. R.* 284 ; 1 *John. C. R.* 299 ; *Montague,* 101 ; 11 *Ves. jr.* 3 ; 1 *Atk. R.* 538 ; 3 *Atk. R.* 304, 814 ; 2 *Freeman's R.* 175 ; *Finch's R.* 219 ; 1 *John. C. R.* 575 ; 4 *Dessau's R.* 286 ; *Mitf.* 222, (3d edit.) ; 1 *Ver. R.* 246 ; 9 *Ves. jr.* 32 ; 3 *P. Wms.* 281 ; 7 *John. C. R.* 67 ; 5 *Mason's R.* 57 ; 1 *Peters' U. S. R.* 373 ; *Jeremy,* 446–7 ; *Fran. Max.* 1 ; 1 *Ver. R.* 244 ; 3 *Salk. R.* 84 ; 2 *Ch. R.* 360 ; 1 *Ver.* 52 ; *Eq. Ca.* 354.

THE CHANCELLOR.   The great object of the bill is to avoid the mortgage given by John Y. Baldwin to Mrs. Johnson, in 1820, after the dissolution of the partnership; on the ground that, as regards the complainant, it is fraudulent, and therefore cannot be sustained.

The complainant has sought, in the first place, to establish by the evidence, that the property on which the mortgage was given, was at the time partnership property; that although the deeds were given to John Y. Baldwin in his own name, yet that in truth, Jesse Baldwin had in equity an equal interest in the purchase.

So far as regards the property in Franklin street, formerly Hiram Freeman's, the fact is established beyond all doubt.   It was purchased at the sale with the partnership funds ; and although the conveyance was made to John Y. Baldwin alone, and therefore the legal title vested in him, he held the one moiety in trust for the benefit of Jesse.   It is the plain case of a resulting

trust, and may be proved by parol.  The fact is admitted in express terms in the answer of John Y. Baldwin.  It was afterwards used as the property of the firm.  They received the rents, paid the taxes, made the repairs, and every thing that was done in relation to it was in the name of the firm.  J. Y. Baldwin alleges that the deed was made to him by mistake; and so far as he is concerned, or his interests brought in question, there can be no difficulty.

As respects the property in Fair street, formerly Mrs. Baldwin's, the case is not so clear.  John Y. Baldwin states, in his answer, explicitly, that he considered that as belonging to himself.  He admits that he purchased it with the partnership funds, for it was sold on an execution in favour of the firm; but says that he made himself debtor to the firm for that amount, and that in preparing that deed, whereby the property was conveyed to him individually, there was no mistake. He assigns several reasons which induced him to make the purchase for his own benefit; some of them are certainly very plausible, and are rendered the more so by the answer of his co-defendant, Mrs. Johnson.  He denies that he held possession of it for the use of the company, or that the same was held and used as partnership property.

I think, however, that the evidence is conclusive to show that this defendant is mistaken in this part of his answer.  There are a great variety of facts going to show that the property was always held under the company, and treated by them as their property; and I do not see how it is possible to reconcile these facts with the allegations in the answer.  The deed bears date in 1813. In March, 1814, a general inventory was taken of the partnership stock and property, as is customary among merchants.  In that inventory is embraced, and in the hand-writing of John Y. Baldwin, this property in Fair street, being the same that was Mrs. Baldwin's; and it is valued at one thousand dollars, and footed up with the valuation of the house in Franklin street, which is admitted to be the property of the firm.  In December of the same year, the taxes were paid to the town collector.  The receipt is drawn by John Y. Baldwin, and is somewhat indistinct; but the property in Fair street is distinguished in it either as the property of the firm, or of Jesse Baldwin, and not of J. Y.

Baldwin. In March, 1815, another inventory of stock, &c. was taken, part of which is in the hand-writing of John Y. Baldwin and part in that of Jesse Baldwin. In this is also included the house in Fair street, valued at one thousand dollars, and that part of the inventory is in the hand-writing of John Y. Baldwin. In the inventory of 1816, also in the hand-writing of John Y. Baldwin, both houses are included. In another inventory, taken in September, 1816, mention is made of two or three houses, which it is presumed has reference to the same ones, but they are not designated, and this inventory appears not to be in the hand-writing of John Y. Baldwin. In January of the same year, (1816,) the direct tax was paid to Seth Woodruff for the year 1815. The receipt, drawn by John Y. Baldwin, is as follows: " Newark, Jan. 28, 1816. Received from Messrs. John Y. Baldwin & Co. the sum of three dollars and thirty-five cents, in full of direct tax for *their house,* lately occupied by Mrs. Esther Baldwin, in Fair street," &c. In October, 1816, a receipt was given by Paul Brown to John Y. Baldwin & Co. for a charge in repairing the pump of *their house* in Fair street. This receipt was drawn by John Y. Baldwin. In May, 1816, a similar receipt was given by Job Meeker to John Y. Baldwin & Co. for work done for *their houses* in Fair street. This was also drawn by John Y. Baldwin. In July, 1816, there are sundry entries made in the company's common day book, of contracts made with various persons for renting the houses in Franklin and Fair streets. These entries are made by John Y. Baldwin; and in describing the houses in Fair street, he in every instance, save one, calls them *our houses.* The same book shows that the rents were paid. In 1817, a part of the property was occupied by David Ball. In July he paid the first quarter's rent, and took a receipt from John Y. Baldwin, in the name of John Y. Baldwin & Co. To Mrs. Williams, who occupied another part, a similar receipt was given by Jesse Baldwin for one quarter's rent; and underneath it, on the same paper, are memoranda made of the receipt of the other three quarters. In 1818, David Conger is charged in the company's ledger with twenty-four pounds rent for that year, for the house in Fair street, and this charge is made by John Y. Baldwin. In 1819, Mrs. Williams occupied part of the

house in Fair street, and in July of that year, John Y. Baldwin gave her a receipt for rent in the name of the firm. And in 1820, in the general inventory that was made of the stock and property of the company at the time of the dissolution, the three houses were again included. In addition to this, it is testified by Isaac Nichols, the assessor of the town, that he was assessor from 1817 to 1823 ; that he was directed by John Y. Baldwin to assess the property in Franklin street and Fair street to the firm of John Y. Baldwin & Co., and that it was so assessed until John Y. Baldwin left the store, since which he has assessed it to the complainant, at his direction.

These facts and circumstances show very conclusively, that not only the house in Franklin street, but the houses in Fair street also, were considered by John Y. Baldwin as belonging to the firm. They were treated by him as such, in all respects. He states in his answer, that he considered himself a debtor to the firm for the amount paid ; but I do not find that he ever charged himself with it, or gave any information to his partner that he considered the property as his own.

The result is, that on the 1st of January, 1820, the property belonged to the firm, and must be so considered in this court, notwithstanding the legal title was in John Y. Baldwin. On the 1st of January, 1820, the partnership was dissolved by mutual consent. The terms were, that Jesse Baldwin, the complainant, should take all the property and pay all the debts ; and in the schedule then made, the houses in Fair street were considered as belonging to the partnership. From that time the whole management and direction of the property was assumed and exercised by the complainant. He made leases, received rents, and acted in every other respect as owner ; and it appears that the title deeds were placed, by common consent, in the hands of an attorney, to have the necessary conveyance prepared, to pass the legal title to the complainant.

After the dissolution, and the agreement upon which it was founded, and as a necessary consequence resulting therefrom, the equitable and beneficial interest in this real estate became vested in the complainant ; and John Y. Baldwin, having received a fair consideration for all his proportion, became a mere trustee for

the benefit of the purchaser. He still had the naked title, but as between him and his former co-partner, it could avail nothing.

I do not consider it necessary to discuss the question which has been much agitated in the chancery of England, as well as our country, whether real estate, acquired with partnership funds, is to be considered as a part of the joint stock, and as such must be brought into the common fund ; or whether it is to be considered as a tenancy in common, and that the rules of partnership property do not apply to it. For, in this case, independently of any partnership regulations, there was an actual agreement and sale of the estate ; and even if we consider these partners as tenants in common in respect of these lands, yet by the agreement and sale, which were made in good faith, and for a valuable consideration, the complainant became entitled, and in equity is considered as owning the whole in severalty.

It follows as a necessary consequence, that after the sale and dissolution, John Y. Baldwin had no right, as against the purchaser, to treat this property as his own. If it were part of the joint stock, his authority over it ceased at the dissolution. He could not use it for his private benefit, nor in any mode inconsistent with the closing of the partnership business: *Gow on Part.* 253. If it were not a part of the joint stock, then having parted with his beneficial interest, and being a mere trustee, he had no right to interfere with the property of his cestui que trust.

But however true this may be, it does not follow that, because John Y. Baldwin may have acted *mala fide*, therefore Mrs. Johnson has no rights. She comes before the court claiming to be a bona fide purchaser for a valuable consideration, without notice of any fraud or improper conduct on the part of John Y. Baldwin; and claiming as she does under the person having the legal title at the time, she is entitled to great consideration.

The rule of equity touching the rights of a person claiming to be a bona fide purchaser for a valuable consideration, is a very strict one, perhaps too strict ; but it is, nevertheless, so well settled, that it ought not to be lightly disturbed. And it does appear to me that the claim of the defendant, Mrs. Johnson, to be considered in the light of such purchaser, cannot be sustained.

She had no knowledge whatever of the pretended title of J. Y. Baldwin. She had understood, and therefore believed, that the title was in him. She placed implicit confidence in his statements. It does not appear from her answer, that she had ever examined or seen, or even inquired for, the title deeds. If inquiry had been made for them at the time the mortgage was given, they could not have been produced. They were in the possession of a third person, for the purpose of preparing a formal transfer to Jesse Baldwin ; and that fact could scarcely have been concealed. Every man purchases at his peril, and is bound to use some reasonable diligence in looking to the title and competency of the seller. It will not answer to rest upon mere reputation or belief, unless the party intends to rely upon his covenants alone.

In this case, too, John Y. Baldwin was not in possession, either by himself or his tenants, at the time the mortgage was taken, nor had he ever any separate and exclusive possession. David Ball says he rented of John Y. Baldwin, but that he recognized both him and Jesse as owners or landlords, and paid the rent at the store. David Conger always paid the rent to Jesse after he returned from New-York, and always thought the property belonged to the firm. Such was the common reputation. Mrs. Williams rented of John Y. Baldwin, who said the property was his ; but Jesse claimed the rent, and she paid it. Henry Earl hired the house in Franklin street in October, 1819 : he hired of Jesse Baldwin, and knew no body else in the transaction. These tenants were in possession in February, 1820, when the mortgage was taken, and it is evident that inquiry from any of them would have given sufficient information to put her upon inquiry. It would have informed her that if it was not the separate property of Jesse Baldwin, it was at least the property of the firm, or claimed as such ; and that firm being dissolved, John Y. Baldwin could not execute a mortgage, or give a title for any part of the property. In *Taylor* v. *Hibbert*, 2 *Ves. jr.* 440, Ld. Roslyn says : "I have no difficulty to lay down, and am well warranted by authority and strongly founded in reason, that whoever purchases an estate from the owner, knowing it to be in the possession of tenants, is bound to inquire into the estate these

tenants have." And again; "It was sufficient to put the pur-
chaser upon inquiry, that he was informed the estate was not in
the *actual* possession of the person with whom he contracted;
that he could not transfer the ownership and possession at the
same time; that there were interests, as to the extent and terms
of which it was his duty to inquire." In *Hiern* v. *Mill*, 13 *Ves.*
120, the principle is expressly recognized. See also *Daniels* v.
*Davison*, 16 *Ves.* 254; *Allen* v. *Anthony*, 1 *Meriv.* 282;
1 *John. C. R.* 299. I am aware that these authorities extend
only to cases in which the rights of the tenants are concerned.
But there is no difference in principle or in reason. The object
of the inquiry would be to ascertain the nature and extent of their
possession and rights; and the notice would be equally good
whether they informed the purchaser of a holding under the ven-
dor or some other person, or whether of a leasehold or a free-
hold interest. In the case of *Daniels* v. *Davison*, cited before,
the person in possession had been a tenant of the vendor, but at
the time of the sale and purchase claimed to hold the property
under an article of agreement to purchase of the vendor. The
court held, that "being in possession under a lease, with an
agreement in his pocket to become the purchaser, gave him an
equity, sufficient to repel the claim of a subsequent purchaser
who made no inquiry as to the nature of his possession." That
was, as I conceive, a stronger case than the present. There it
was admitted the person in possession was in under the lease,
and it was argued that the most the purchaser was bound to take
notice of was some leasehold interest; but the court held, that if
his title was good as against the purchaser under a lease for forty-
five years, it would be good for a greater interest.

I think there is weight in the position advanced by the coun-
sel of the complainant, that Mrs. Johnson cannot claim the pro-
tection of a bona fide purchaser, because here there was no mo-
ney paid; that this was a mere collateral security; that the old
notes were not given up, and consequently that the party, in the
language of the books, *is not hurt.* The rule undoubtedly is,
that the person claiming such protection must have paid the pur-
chase money; to have secured it, will not answer. The court
gives protection in the peculiar case, on the ground that it is ab-

solutely necessary ; that without it, the money must inevitably be lost : *Wallwyn* v. *Lee*, 9 *Ves. jr.* 32 ; *Harrison* v. *Heathcote*, 1 *Atk.* 538 ; 3 *Atk.* 304, *Hardingham* v. *Nicholls ; Maitland* v. *Wilson*, 3 *Atk.* 814 ; *Beekman* v. *Frost*, 18 *John. R.* 562. I have doubts whether this case could be considered within the rule, but I do not find it necessary to decide the question.

The result of my judgment on this part of the case is, that this mortgage cannot be sustained as against Jesse Baldwin. John Y. Baldwin made the conveyance without a particle of authority, and in fraud of the rights of the complainant ; and Mrs. Johnson received the mortgage without any investigation, relying entirely upon the integrity of the mortgagor, when the slightest inquiry would have sufficed to satisfy her that he had no right whatever to meddle with the property. I regret this conclusion, seeing that the defendant, Mrs. Johnson, is a female, and probably unacquainted with business ; but I am not able to bend the rule to meet her particular situation. I am induced to believe that she has acted honestly in the whole matter, notwithstanding a number of circumstances calculated to excite suspicion, and certainly showing very great incaution. The facts, that in 1819 this partnership note was renewed without any notice to Jesse Baldwin ; that in the same year she took a conveyance from John Y. Baldwin of the Caldwell property for a trifling consideration, part of which was to pay the interest due on the note ; that soon after, when in consequence of difficulties between the partners she applied to John for further security, and took his individual property to secure the partnership debt, after the dissolution, and without having the mortgage registered ; and that of all these matters Jesse Baldwin, though a near neighbour and responsible man had no kind of notice ; would naturally lead to a suspicion that there was a studied effort to conceal them from him, unless their disclosure should become actually necessary. If this were the honest debt of the company, there could be no possible motive for concealment. But as the defendant has positively denied any intentional misconduct, I am not at liberty to disbelieve her, and therefore regret the necessity that impels me to take from her the security on which she rested.

It was insisted by the defendant's counsel, that if the mortgage

should not be good as against Jesse, it should be available in equity against the moiety of the property, the legal title of which was in John at the time the mortgage was given. This I think cannot be, without unsettling the principles already established. She had notice, or might have had notice, that this was, or had been, partnership property; and the partnership being dissolved, that John Y. Baldwin had no right to make such conveyance. Or if it should be contended, that this being real property, the parties, on the dissolution, held it as tenants in common, then she had notice, or might have had notice, that the beneficial right and interest of John Y. Baldwin was vested in Jesse, and of course that a mortgage would be of no avail. At the time of executing the mortgage, John had no interest to bind or to convey, and the mortgagee can take nothing under it.

It was also contended, that the original notes were given for money advanced to the firm, and that the court ought to hold this property liable for the payment of the debt, before the mortgage is delivered up. I am not disposed to question the original debt, or the liability of the firm to pay it. They are matters with which, as it appears to me, I have no concern; and hence I shall not grant that part of the complainant's prayer which seeks to have the notes cancelled. But I do not see the way clear in ordering the notes to be paid out of this particular fund. The whole property of the partners is liable for the payment of the partnership debts. If all can be paid, it is well. If not, they must be paid pro rata; or at all events, this court cannot establish a preference, the only foundation for which would be an unauthorized and fraudulent act of a partner after dissolution.

I have examined the pleadings carefully, to ascertain how far the court would be authorized to make any order or give any direction in relation to the payment of the notes, and it appears to me that that matter is not within the case. The bill prays relief against the mortgage; and although it prays that the notes may be given up to be cancelled, yet that seems to be on the ground that they are merely colourable, and therefore no foundation for the mortgage, and that to effect the complainant's object, (the avoidance of the mortgage,) it might be necessary to go into the consideration of the notes.

58

The decree of the court is, that the mortgage be delivered up to be cancelled, and that the defendant be perpetually restrained from all further proceedings on the execution.

Not being satisfied that there is any fraud in this case on the part of Mrs. Johnson, I shall not order costs as against her.